*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1801**

State of Minnesota,
Respondent,

vs.

William Lee Hutchins, Jr.,
Appellant.

**Filed July 25, 2016
Affirmed
Larkin, Judge**

Nicollet County District Court
File No. 52-CR-14-109

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michelle M. Zehnder Fischer, Nicollet County Attorney, James P. Dunn, Assistant County Attorney, St. Peter, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Kirk, Presiding Judge; Connolly, Judge; and Larkin, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges the district court's denial of his motion to suppress a short-barreled shotgun that police found while searching his vehicle pursuant to his consent. Appellant argues that the police unconstitutionally expanded their traffic stop of his vehicle by asking for his consent to search the vehicle. Because the request to search appellant's vehicle was supported by reasonable suspicion of illegal activity, the resulting search was not unconstitutional. We therefore affirm.

**FACTS**

Respondent State of Minnesota charged appellant William Lee Hutchins Jr. with two counts of possession of a firearm by an ineligible person and one count of possession of a short-barreled shotgun. Hutchins moved to suppress the firearm, arguing, in part, that the stop of the vehicle in which police found the firearm was unconstitutionally expanded beyond its permissible scope. The district court held a hearing on Hutchins's motion, heard testimony from Officer David Arpin of the St. Peter Police Department, and found the relevant facts to be as follows.

Around 1:00 a.m. on March 25, 2014, Minnesota Department of Natural Resources Conservation Officer Corey Wiebusch observed a vehicle traveling at a slow speed on a gravel road that intersected Highway 22 in Nicollet County. Officer Wiebusch observed the vehicle turn south and then onto Nicollet County Road 15, heading west. Officer Wiebusch followed the vehicle on County Road 15 for about a quarter of a mile before it turned into a driveway. After Officer Wiebusch drove past the

driveway, he noticed that the vehicle backed out of the driveway and began travelling east on County Road 15. Given the time of day, Officer Wiebusch considered the driving conduct suspicious. Officer Wiebusch followed the vehicle and paced it moving at speeds over the posted speed limit. The officer eventually stopped the vehicle after it turned into a trailer park in St. Peter.

Officer Wiebusch approached the vehicle and asked Hutchins, who was driving, for his driver's license and proof of insurance. Hutchins provided Officer Wiebusch with a Minnesota driver's license but could not produce proof of insurance. Officer Wiebusch ran a computer check and learned that Hutchins's license was suspended. He called a St. Peter police officer, Paul Hagen, and asked him if he knew Hutchins. Officer Hagen advised Officer Wiebusch that he knew Hutchins. Because Officer Hagen was busy with another matter, he asked Officer Arpin to assist Officer Wiebusch.

After speaking with Officer Hagen, Officer Wiebusch asked Hutchins where he was headed. Hutchins replied that he was just out for a drive. Hutchins indicated that he was at the trailer park to drop his passenger off at a friend's home. Officer Wiebusch asked who the friend was, and neither Hutchins nor his passenger could provide a name. Officer Wiebusch informed Hutchins that he planned to issue him a citation for driving with a suspended license. He instructed Hutchins to remain in his vehicle and told Hutchins that he would be with him shortly.

Officer Arpin arrived at the trailer park at approximately 1:10 a.m. As Officer Arpin walked toward Officer Wiebusch's vehicle, he passed Hutchins, and Hutchins called out to him saying, "Hey, Arpin, can you get me out of this?" Officer Arpin

3

recognized Hutchins from prior contacts. Officer Arpin responded that it was Officer Wiebusch's stop and that Hutchins knew he should not have been driving. As Officer Arpin spoke with Hutchins, he noticed that Hutchins's eyes were red, glassy, watery, and bloodshot.

Officer Arpin spoke with Officer Wiebusch, who indicated that Hutchins was driving with a suspended license. Officer Arpin asked Officer Wiebusch whether Hutchins had been drinking, and Officer Wiebusch replied that he did not know. Officer Arpin then asked Officer Wiebusch if the passenger in the vehicle had a valid driver's license, and Officer Wiebusch responded that he had not checked the passenger's status.

Officer Arpin returned to Hutchins's vehicle and spoke with the passenger. Officer Arpin told the passenger that Hutchins's driver's license was suspended and that he wanted to determine if the passenger could drive the vehicle. While Officer Arpin spoke to the passenger, Officer Arpin noticed an odor of alcohol and asked him to submit to a preliminary breath test (PBT). The passenger agreed, and the PBT registered a 0.036 alcohol concentration. Hutchins then asked Officer Arpin if he could take a PBT because he had never taken one before. Officer Arpin tested Hutchins, and his PBT registered a 0.00 alcohol concentration.

During this interaction, Officer Arpin observed that Hutchins's pupils were very large and that he seemed hyper, antsy, talkative, and excitable. Officer Arpin noted that Hutchins's demeanor was different than the subdued and quiet demeanor that he had exhibited in his prior contacts with Officer Arpin. Given Hutchins's large pupils, his excited state, and the absence of alcohol in his system, Officer Arpin suspected that

4

Hutchins may have recently used methamphetamine. Officer Arpin asked Hutchins if he had anything illegal in his vehicle. Hutchins replied "No." Officer Arpin also asked Hutchins if he could search his vehicle. Hutchins indicated that he could do so.

During the ensuing vehicle search, Officer Arpin found a short pump-style shotgun with a pistol grip in a rolled-up sweatshirt in the rear passenger seat area. Upon inspection, it appeared that the gun was a shotgun with a sawed-off barrel.

The district court denied Hutchins's motion to suppress the shotgun. Hutchins stipulated to the prosecution's case under Minn. R. Crim. P. 26.01, subd. 4, to obtain review of the district court's ruling, and the district court found him guilty as charged. This appeal follows.

## D E C I S I O N

Hutchins contends that "evidence seized during the search of [his] vehicle must be suppressed because officers unlawfully expanded the scope of a routine traffic stop" by asking to search the vehicle. Although Hutchins challenged the basis for the traffic stop in district court, he does not raise that issue on appeal.

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures by the government. U.S. Const. amend. IV; Minn. Const. art. I, § 10. However, a police officer may initiate a limited, investigative stop without a warrant if the officer has reasonable, articulable suspicion of criminal activity. *State v. Munson*, 594 N.W.2d 128, 136 (Minn. 1999) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)). "[E]ach incremental intrusion during a stop must be strictly tied to and justified by the circumstances which rendered the initiation of the stop permissible." *State v. Askerooth*,

5

681 N.W.2d 353, 364 (Minn. 2004) (quoting *Terry*, 392 U.S. at 19, 88 S. Ct. at 1878) (quotation marks omitted).

Under the Minnesota Constitution, "an intrusion not strictly tied to the circumstances that rendered the initiation of the stop permissible must be supported by at least a reasonable suspicion of additional illegal activity." *State v. Smith*, 814 N.W.2d 346, 350 (Minn. 2012). The extension of a traffic stop does not violate Minn. Const. art. I, § 10 "as long as each incremental intrusion during the stop is tied to and justified by one of the following: (1) the original legitimate purpose of the stop, (2) independent probable cause, or (3) reasonableness, as defined in *Terry v. Ohio*." *Id.* (quotation omitted). "When a search is conducted pursuant to consent . . . , neither probable cause nor a warrant is required." *State v. Pilot*, 595 N.W.2d 511, 519 (Minn. 1999). However, "in the absence of reasonable, articulable suspicion a consent-based search obtained by exploitation of a routine traffic stop that exceeds the scope of the stop's underlying justification is invalid." *State v. Fort*, 660 N.W.2d 415, 416 (Minn. 2003).

In assessing reasonable suspicion, Minnesota courts "consider the totality of the circumstances and acknowledge that trained law enforcement officers are permitted to make inferences and deductions that would be beyond the competence of an untrained person." *State v. Richardson*, 622 N.W.2d 823, 825 (Minn. 2001) (discussing reasonable suspicion in context of initial investigatory stop). The reasonable-suspicion standard is "less demanding than probable cause," but requires more than an unarticulated "hunch." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (quotation omitted). This court reviews a district court's determination of reasonable suspicion de novo, but accepts the

6

district court's factual findings unless they are clearly erroneous. *Smith*, 814 N.W.2d at 350.

Hutchins compares the circumstances of this case to those in *State v. Fort*. In *Fort*, two officers stopped a vehicle for speeding and having a cracked windshield. 660 N.W.2d at 416. After determining that neither the driver nor the passenger had a valid driver's license, the officers decided to tow the vehicle. *Id.* at 417. One of the officers questioned the passenger about whether there were any drugs or weapons in the vehicle or in his possession and asked the passenger if he could search him for drugs or weapons. *Id.* The passenger consented to the search, which resulted in the recovery of crack cocaine. *Id.*

The Minnesota Supreme Court noted that the only grounds offered for the expansion of the traffic stop were that the stop occurred in a "'high drug' area" and that the officer intended to give the passenger a ride home and therefore conducted the search for purposes of officer safety. *Id.* at 419. The court ultimately concluded there was not a valid basis to expand the traffic stop because the investigation of narcotics and weapons was not connected to the purpose of the stop and there was no reasonable, articulable suspicion of any other crime. *Id.*

The facts in this case are distinguishable from those in *Fort*. Officer Arpin observed multiple indicia that Hutchins had recently used a controlled substance: (1) Hutchins's eyes were red, glassy, watery, and bloodshot; (2) Hutchins's pupils were very large; (3) Hutchins seemed hyper, antsy, talkative, and excitable, which was different from the subdued and quiet demeanor that he exhibited during his prior contacts

7

with Officer Arpin, and (4) Hutchins behaved strangely, asking Officer Arpin if he could get Hutchins out of the traffic stop and requesting to take a PBT. Based on his observations, including the lack of alcohol in Hutchins's system, Officer Arpin reasonably suspected that Hutchins had recently used methamphetamine. *See Richardson*, 622 N.W.2d at 825 (noting that in determining whether reasonable suspicion exists, courts acknowledge that "trained law enforcement officers are permitted to make inferences and deductions that would be beyond the competence of an untrained person").

Unlike the officer in *Fort*, Officer Arpin did not turn a routine traffic stop into a broad investigation of uncertain wrongdoing. We note that Hutchins himself initiated his conversations with Officer Arpin. In addition, Officer Arpin made his incriminating observations of Hutchins while asking Hutchins's passenger questions to determine whether he could drive the car from the scene and that questioning was tied to the original purpose of the traffic stop.

The facts in this case more closely resemble those in *State v. Volkman*, 675 N.W.2d 337 (Minn. App. 2004). In *Volkman*, an officer woke up a driver who was sleeping in his truck on a gravel road. 675 N.W.2d at 339. The driver claimed that he was tired and that he had pulled off the road to sleep. *Id.* at 340. The officer observed that the driver "was disoriented, his eyes were red and bloodshot, . . . he was confused about where he was," and "'it took him a long time to answer questions.'" *Id.* at 339-40. The driver still appeared "groggy" 20 minutes after the officer woke him. *Id.* at 340 (quotation marks omitted). Based on those observations, and because the officer did not

smell alcohol, the officer suspected that the driver was under the influence of a controlled substance. *Id.*

The driver's state of confusion also caused the officer to suspect that drugs might be inside the truck. *Id.* The officer asked the driver if he could search the truck, and the driver consented to the search, which resulted in the discovery of drug evidence. *Id.* This court concluded that the officer's observations, "unlike the subjective conclusions in *Fort*, presented a particularized reason for expansion of the original stop and a basis for [the officer's] request for consent to search the vehicle." *Id.* at 341-42.

Like the officer in *Volkman*, Officer Arpin observed multiple indicia of controlled-substance use. Those observations led the officer to suspect that Hutchins had recently used methamphetamine and provided a particularized suspicion of criminal activity. *See* Minn. Stat. § 169A.20, subd. 1(2) (2012) (criminalizing driving under the influence of a controlled substance); *Volkman*, 675 N.W.2d at 342; *see also* Minn. Stat. § 152.02, subd. 3(a), (d)(2) (2012) (classifying methamphetamine as a Schedule II controlled substance); Minn. Stat. §§ 152.021, subd. 2(a)(1), .022, subd. 2(a)(1), .023, subd. 2(a)(1), (6), .024, subd. 2(2), .025, subd. 2 (2012) (criminalizing possession of methamphetamine). And that suspicion justified expansion of the original stop to include Officer Arpin's request to search the vehicle. *See Volkman*, 675 N.W.2d at 341-42.

Hutchins argues that "even if Arpin had reasonable suspicion that [he] was under the influence of a controlled substance, [Officer Arpin's] actions were not reasonably related to investigating that potential offense." Hutchins contends that "[i]f Arpin had reasonable suspicion that Hutchins was under the influence of a controlled substance,

9

Arpin should have conducted field sobriety tests rather than perform a full-blown, invasive search." Hutchins asserts that conducting field sobriety tests would have been strictly tied to Officer Arpin's suspicion and that searching Hutchins's vehicle was not tailored to the offense Officer Arpin was investigating.

Although Officer Arpin could have conducted field sobriety tests, his request for consent to search Hutchins's vehicle nonetheless was a permissible expansion of the traffic stop. It was reasonable for Officer Arpin to suspect that someone who appeared to have used methamphetamine before driving might have methamphetamine evidence in the vehicle he was driving. *See id.* (concluding that officer's observations suggesting motorist was under the influence of a controlled substance presented a particularized reason for expansion of the original stop and a basis for officer's request to search motorist's vehicle).

In sum, the circumstances in this case gave rise to reasonable suspicion that Hutchins was involved in illegal activity beyond that which justified the initial traffic stop. That suspicion justified expanding the scope of the traffic stop to include the request to search Hutchins's vehicle. *See id.* at 342. Because Officer Arpin's expansion of the traffic stop was justified by reasonable suspicion of additional illegal activity, the district court did not err by denying Hutchins's motion to suppress.

**Affirmed.**

10